CASE 9.—FORCIBLE ENTRY PROCEEDING BY WILLIAM OWSLEY AND OTHERS AGAINST CANADA RICHIE. —October 20, 1909.

## Richie v. Owsley, &c.

Appeal from Knott Circuit Court.

D. W. GARDNER, Circuit Judge.

Judgment for plaintiffs, defendant appeals.—Reversed.

1. Forcible Entry and Detainer—Civil Liability—Nature and Form of Remedy.—It is not competent to try title in forcible entry, but in whom the legal title was vested at the time of entry is material and necessary to be ascertained, where on that alone depends the question whether plaintiff was in actual possession when defendant entered.

2. Forcible Entry and Detainer—Actual Possession to Maintain Action.—The same kind of actual possession that will in time ripen into a good title will maintain an action of forcible entry.

3. Forcible Entry and Detainer—Pleading and Proof.—It is always a relevant inquiry, on the plea of not guilty in forcible entry proceedings, whether plaintiff was in the actual possession of the premises, as well as whether defendant forcibly entered thereon.

4. Adverse Possession—Actual Possession—How Acquired.— Actual possession of land in this state may be acquired, either by physical inclosure of the whole boundary or by an inclosure of a part under a claim of title to the whole, if no one else is asserting title to any part of the boundary on which claimant has so entered.

5. Adverse Possession—Evidence of Extent of Claim and Possession.—If one enters land under a paper title, it may be looked to as showing the extent of his claim and possession;. or, if he enters without a paper, claiming to a marked boundary, that fact may be shown as indicating the extent of his possession.

6. Adverse Possession—Extent of Actual Possession.—If an entrant goes on a boundary under a junior patent, entirely or partly within a senior grant or survey, he will be deemed in actual possession of only so much as he actually incloses, if the owner of the senior grant is then in actual possession of his boundary; or, if the owner of the senior grant be not in actual possession, but enters before the junior patentee ripens title by adverse possession, the latter will ipso facto be restricted to his actual close.

7. Public Lands—Patent as Conferring Legal Title on Grantee. —If there be no other or older grant from the state to lands covered by a patent under which a party claims, the patent confers on him the legal title, unless another has by actual adverse possession acquired title thereto dehors a patent.

8. Property—Constructive Possession.—The owner of a legal title is in constructive possession of all land within his boundary not in actual possession of somebody else.

9. Landlord and Tenant—Actual Possession of Lessee.—A written lease of patented land, title to which was created by the patent, and which had devolved on lessor either by conveyance or by operation of the statute of limitations prior to another's entry thereon, invests lessee with the actual possession at the time of such entry.

10. Adverse Possession—Limitation Against Commonwealth.— Since January, 1893, limitation may run against the commonwealth, as expressly provided by Ky. St. Sec. 2523; Gen. St. c. 71, art. 3, Sec. 10.

11. Adverse Possession—Evidence—Sufficiency.—Evidence held insufficient to show adverse possession against the commonwealth for the statutory period prior to the date of patent for land in controversy.

12. Adverse Possession—Necessity of Claim and Possession Being Continuous.—A claim and possession, on which title by

adverse possession is based, must be shown to have been continuous.

13. Forcible Entry and Detainer—Evidence—Admissibility.—In forcible entry, it was error to exclude evidence for plaintiffs of a survey of land covering that in dispute, made for a certain party prior to the patent to defendant's lessor, under whom defendant claimed the right to enter.

14. Forcible Entry and Detainer—Evidence—Admissibility.—In forcible entry, it was relevant to show, in support of plaintiff's actual possession when defendant entered, that a tract covering the area in dispute was patented, and had been in the actual adverse possession of plaintiff's lessor and its vendors for 15 years prior to the patent to defendant's lessor.

15. Forcible Entry and Detainer—Scope of Inquiry—Title and Possession.—While title cannot be tried in a forcible entry proceeding, possession can be.

16. Forcible Entry and Detainer—Admissibility of Evidence—Title Papers.—In forcible entry, title papers may be received to show the extent of possession, or to show that it was limited, if they do show it.

17. Public Lands—Conflicting Patents—Effect of Priority.—If land in dispute in forcible entry was patented prior to a patent to defendant's lessor, the latter patent would be void, and could not be received as evidence tending to limit the possession of plaintiff's lessor.

O. H. POLLARD AND W. W. CRAFT for appellant.

SMITH & COMBS for appellees:

OPINION OF THE COURT BY JUDGE O'REAR—Reversing.

William Howard by his deed conveyed to J. F. Bullitt a tract of land on waters of Quicksand creek in Knott county, described as containing 1,203 acres. Bullitt conveyed to the Virginia Kentucky Coal Corporation. It executed a lease to appellee Wm. Owsley as its tenant. Only a small part of the tract was cleared of its forest or inclosed. But the written lease described the entire boundary as having been

leased to Owsley. Thereafter appellant, as tenant of Hayes, went upon that boundary, but outside of the inclosure upon it, and built a hut. This forcible entry proceeding followed. It was tried on traverse in the circuit court. This appeal involves the correctness of rulings of the circuit court in that trial.

Hayes in January, 1888, obtained a patent from the commonwealth of Kentucky for 200 acres, within which his tenant settled as above stated. Whether that patent was void because the land for which it was issued had been previously entered, surveyed, or patented (section 4704, Ky. St. [Russell's St. sec. 2758a3]) becomes a material question in this case as affecting the fact whether Owsley was in the actual possession of the land under his lease when Richie, Hayes' tenant, entered. It is not competent to try the title in this character of proceeding, but because of the peculiar situation, the fact of where the legal title was then vested is material, indeed is necessary to be ascertained, as upon it alone depends the question, one of mixed fact and law, whether Owsley was in actual possession of the premises when Richie entered.

It was shown in the evidence that Wm. Howard obtained a deed for this 1,203-acre tract in February, 1888, from his sisters, Mrs. Shepherd and Mrs. Fitzpatrick, and at that time the boundary was plainly marked with aged marks upon its line and corner trees; that it was so marked as early at least as in 1871; that William Howard was born upon that tract of land, and had lived there for the whole of his life (about 50 years) up until he sold it to Bullitt; that William Howard cut the timber from the part near where Richie built his cabin, and held it since 1888. The in-

ference is that Wm. Howard's father owned the land prior to his death (date not shown), and that Wm. Howard and his two sisters inherited it, though there are not enough facts in the evidence to make this inference necessary, or even permissible, as proof. Appellees' position in the argument is, and such seems to have been the view of the circuit court, that since the deed of February, 1888, to Wm. Howard, he then and thereafter actually residing within the boundary described in the deed, he was in actual possession of that entire boundary, whether or not he had the legal title to it; that actual possession was the only thing necessary to enable the possessor to maintain forcible entry proceedings against one who entered upon the boundary without the former's permission; that enough was shown to sustain the verdict and judgment of guilty. It has been laid down as the law, and we think that it is necessarily true, that the same kind of actual possession that will in time ripen into a good title will maintain an action of forcible entry. Henry v. Clark, 4 Bibb. 426; Brumfield v. Reynolds, 4 Bibb. 388; Howard v. Whitaker, 61 S. W. 355, 22 Ky. Law Rep. 1775; Wall v. Nelson, 3 Litt. 395; Chiles v. Stephens, 1 A. K. Marsh. 334.

If the only question here was the sufficiency of such possession to maintain the writ, and had nothing appeared regarding the Hayes patent, a case would have been made out, as it was shown to the jury's satisfaction that Richie had built his cabin within the 1,203-acre tract included in Owsley's leasehold. But it is always a relevant inquiry, on the plea of not guilty, whether the plaintiff was in actual possession of the premises, as well as whether the defendant forcibly entered thereon. An actual possession of

land in this state may be acquired, either by a physical inclosure of the whole boundary, or by an inclosure of a part of the boundary under a claim of title to the whole, if no one else is asserting title to any part of the boundary upon which he has so entered. If he enters under a paper title, the paper may be looked to as showing the extent of his claim and possession; or, if he enter without a paper, but claiming to a marked boundary, that fact may be shown as indicating the extent of his possession. But there are certain limitations upon the rule just announced. If the entrant goes upon a boundary under a junior patent, which latter is entirely or partly within a senior grant or survey, he will be deemed to be in the actual possession of only so much of the land as he actually incloses, if the owner of the senior grant is then in the actual possession of his boundary; or, if the owner of the senior grant be not in the actual possession of the boundary in his grant, but enters thereon before the patentee of the junior grant has ripened a title by adverse possession, the latter will ipso facto be restricted to his actual close. Rulings of this court to the above effect are so numerous and consistent that it is not thought necessary to cite the cases here.

Nor do we know from this record whether the Howards or any one else had a grant from the state for this 1,203 acres, or that part embracing the 200 acres covered by Hayes' patent. There was no evidence on that point. If it should be conceded that there was not such a grant, or any grant older than Hayes, then Hayes' patent would have conferred upon him the legal title to the 200 acres, unless Howard had by actual adverse possession acquired title thereto dehors a patent. Whether Howard had so

acquired a title will be again adverted to. If Hayes
had the legal title in January, 1888, he had thereby
the constructive possession of all the land within his
boundary not in the actual possession of somebody
else. So when Wm. Howard took the deed from his
sisters in February, 1888, he would acquire the legal
title to only that which they were seized of in fee
simple when they conveyed; his actual possession
could not, except by inclosure or physical occupancy,
oust the constructive possession of Hayes in the
200 acres, no part of which was within Howard's in-
closures.

The constructive possession of land follows the
legal title, and remains until ousted by an actual ad-
verse possession. If Hayes was the owner of the
legal title to the 200 acres, then he had the right of
possession, and if he owned the legal title, Howard
was not in actual possession of this forest land by
virtue solely of his sisters' deed. If that were the
case, Richie's entry was not tortious. If the 1,203
acres, or that part of it including the settlement of
Howard and the plot where Richie built his cabin,
had been previously patented, and title thereby
created had devolved upon the plaintiff's lessor,
either by conveyance or operation of the statutes of
limitation prior to Richie's entry, then the written
lease to Owsley would have invested him with the
actual possession of the land in controversy at the
time of entry. Or, if the 1,203 acres had not been
previously patented, but Howard and those under
whom he claimed had been in the continuous actual
adverse possession of that boundary for 15 years im-
mediately prior to January 25, 1888, the land in that
event would not have been vacant land, and Hayes'
patent to it would have been void. Since January,

1873, limitation may run against the commonwealth. Section 10, art. 3, c. 71, Gen. St. 1888; section 2523, Ky. St. (Russell's St. sec. 240); Commonwealth v. Nute, 115 Ky. 239, 72 S. W. 1090, 24 Ky. Law Rep. 2138; C., St. L. & N. Ry. Co. v. Commonwealth, 115 Ky. 278, 72 S. W. 1119, 24 Ky. Law Rep. 2124; L. & N. R. R. Co. v. Smith, 125 Ky. 336, 101 S. W. 317, 31 Ky. Law Rep. 1. It was therefore possible for the statute to have tolled the title of the state before the patent to Hayes was issued.

It is the contention of appellees that Howard and those under whom he claimed had had such possession for the statutory period of 15 years, prior to January 25, 1888. The strongest evidence in this record on that point is the testimony of Wm. Howard, from which we quote the following: "Q. How old are you? A. I was 50 years old on the 28th day of last February. Q. I want to read to you a boundary of some land deeded to you from Elizabeth Fitzpatrick. [Reads boundary.] Do you know that boundary? A. Yes, sir. Q. Is that what is known as the Bill Howard farm? A. Yes, sir. Q. You say you were born on that tract of land? A. Yes, sir, I was was born on that place. Q. And you say you are 50 years old? A. Yes, sir. Q. How long did you live there? A. Until I was grown, married, and had a family. Q. Who lived there when you moved away? A. I rented the place to other parties when I moved over to Buckhorn. Q. Is this boundary of land the same boundary that you conveyed to Bullitt, who conveyed the same to the Virginia Kentucky Coal Corporation? A. Yes, sir; it is. Q. Now do you know where that little house is over there said to have been built by the Hayeses and Richie? A. Yes, sir; I seen it one time. Q. Is that house inside of the

boundary of the deed to you? A. Yes, sir; it is inside that boundary. Q. Are you acquainted with the lines of this deed all the way around the boundary described? A. Yes, sir; I am. Q. How do you distinguish the lines? A. It is marked out. Q. How long has it been marked out? A. I couldn't just state. It has been surveyed 37 years ago last October, the land where this house was built. Q. It was marked 37 years ago? A. Yes, sir. * * * Q. Now when you lived there, Mr. Howard, when you lived in the house, to what extent did you claim possession to this boundary of land? A. To the dividing ridge and to the marked lines. Q. Did that include this land where the hut is built? A. Yes, sir. Q. What did you ever do upon this boundary, if anything? A. I sold a lot of timber. Q. Was it marked out? A. Yes, sir; quite a number of poplars. * * * Q. Had you had possession and tenants on that land from the time you moved until you disposed of it to Bullitt for the company? A. Yes; most of the time. Q. To what extent did you claim possession during this time? A. Claimed it because I was living on it. * * * Q. You do know that the deed from Elizabeth Fitzpatrick to you, and that deed that you made to Bullitt for the Virginia Kentucky Coal Corporation cover that hut they built? A. Yes, sir. Q. And you by tenant and yourself have been in possession claiming it to the outside lines of those deeds since it was made in 1888? A. Yes, sir. * * * Q. While you lived there and owned this land did you exercise ownership over it to those marked lines that you spoke of with the intention of holding the whole of it. A. Yes, sir.''

This witness did not show, nor did any evidence offered tend to show, that the witness Wm. Howard

had any title, or asserted any claim to the land prior to 1888. While he says he ''was born on the farm,'' and that he lived there till after he was married and had a family, yet he does not state that at that time he was claiming to own the land. Nor is it shown that the witness' claim and possession were continuous.

An effort was made by the plaintiffs to show that a survey for 200 acres, dated October 7, 1871, made for Wm. Dobson, covered the land in dispute. But the trial court excluded it, which ruling was error.

It was relevant to show that the 1,203 acres, including the Howard settlement and the area in dispute here, were patented lands; that they had been in the actual adverse possession of the plaintiff's lessor and its vendors for 15 years prior to January 25, 1888. This evidence regarding previous adverse possession was admissible in this proceeding upon the same principle that the title papers were; that is, to show the fact of actual possession in Owsley when Richie entered. While title can not be tried in this proceeding, possession can be. Title papers may be received as evidence showing extent of possession. So may any other fact that tends to show the same thing. Upon the same principle title papers may be introduced to show that the possession was limited, if they do show it. The question for the jury will be, not who owns the land, nor the finding of any fact upon which the court could predicate a judgment of ownership. But it is who was in possession, if any one. It is not perceived why any relevant fact that tends to show possession, or to limit it, or to exclude it, may not be received, although the same evidence might be relevant also in an action of ejectment or trespass. If the land in dispute was patented prior

to the issual of Hayes' patent, then the latter would be void, and could not be received as evidence in this case tending to limit the possession of appellee's lessor. The question for the jury would then be whether Owsley was in actual adverse possession of the 1,203-acre boundary, and in defining what is actual possession under the circumstances the court should tell the jury what antecedent facts would give, and what would oust the lessee's actual possession. The trial in several particulars did not conform to these principles.

Whereupon the judgment is reversed, and cause remanded for a new trial consistent herewith.